ESTATE OF MARTHA B. WATTS, WILLIAM HUBERT LINDSEY, JR., EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Watts v. Commissioner
Docket No. 27005-82.
United States Tax Court
T.C. Memo 1985-595; 1985 Tax Ct. Memo LEXIS 38; 51 T.C.M. (CCH) 60; T.C.M. (RIA) 85595; December 9, 1985. E. Michael Masinter and Howard O. Hunter, for the petitioner. Bettie N. Ricca, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined a deficiency of $12,236,100.06 in petitioner's Federal estate tax. After concessions, the issues for our decision are: (1) the fair market value of the decedent's 15 percent partnership interest in Rosboro Lumber Co., as of December 7, 1978; (2) whether accrued interest on a certificate of deposit should have been included in the decedent's gross estate. FINDINGS OF FACT The stipulations of facts and the exhibits attached thereto are incorporated herein by this reference. The situs of the estate was Fulton County, Georgia, at the *39 time the petition in this case was filed. Valuation of Partnership Interest
On December 7, 1978, the date of her death, Martha B. Watts (Watts) held a 15 percent interest in Rosboro Lumber Co. (Rosboro), an Oregon general partnership. As of the valuation date, Rosboro had been engaged in the wood products industry for over 30 years. It manufactured and sold lumber, plywood, veneer and laminated beams from logs harvested from its own lands and purchased from others. It owned approximately 22,300 acres of timberland which were located primarily in Lane County, Oregon. Approximately 84 percent of the timber was Douglas fir and the balance was hemlock, cedar, and other species. Rosboro was managed by Paul Cole (Cole), who was a partner as well as general manager. Cole assembled a competent management team but the loss of Cole would have been a substantial loss. The relevant provisions of the partnership agreement provided: No partner shall, except with the consent of the other partners, assign, mortgage, pledge, or sell his share in the partnership or in its capital assets or property, or enter into any agreement as a result of which any person shall become interested with *40 him in the partnership, or do any act or make any commitment detrimental to the best interests of the partnership or which would make it difficult or impossible to carry on the ordinary business of the partnership. * * * This partnership shall continue until dissolved by the voluntary action of one or more of the partners. The death of a partner shall not cause the dissolution or termination of this partnership, which shall, in such event, continue as a partnership between the surviving partners and the estate of a deceased partner or partners, by means of the substitution of the legal representative of the estate of the deceased partner or partners until the deceased partner's estate is closed, and the partnership shall thenceforth be continued as provided in paragraph 14 of the agreement. * * * It is understood that each of the partners will have made provision for a testamentary disposition of their interests in the partnership, so that in the event of the death of any of the partners their respective estates will be represented in due course by trustees or others, who will be authorized to accede to their partnership interests and enable the partnership to be continued *41 without a dissolution or termination * * * and it is agreed that in the event of the death of any partner the surviving partners and the legal representative of the estate of the deceased partner or partners, or the respective heirs or devisees, shall either reorganize the partnership and continue the same without dissolution or termination, or the partnership business shall be transferred to a corporation to be organized and in which the legal representative of the estate or the respective heirs or devisees shall accept the decedent's or decedents' proportionate share or shares as indicated by the profit and loss sharing ratios set out herein of the corporate stock of the corporation in complete discharge of the claims against the partnership and the partners on account of his or her partnership interest. * * * Item Four of the decedent's will provided: Any partnership interest that I may own at the time of my death in Rosboro Lumber Company, a general partnership existing under the laws of the State of Oregon, or in any successor partnership, corporation, firm or entity thereof, or any equity interest that I may own at the time of my death as the result of a merger or acquisition *42 of the said Rosboro Lumber Company (but not including any stock listed on a recognized securities exchange, cash, notes or the equivalent thereof that I may own as a result of the sale of Rosboro Lumber Company or my interest therein), I give, devise, and bequeath to my nephew, WILLIAM HUBERT LINDSEY, JR., as Trustee, upon the uses and trusts hereinafter set out: A. My Trustee shall hold said interest as the sole asset in this trust and shall be relieved of any fiduciary duty to sell said interest for the purpose of creating a diversity of investments. My Trustee shall have no authority to sell said interest except in a transaction in which a majority of the holders of equity interests in said company (or any successor thereof) sell their interests. The estate tax return for the Estate of Watts was filed on September 7, 1979. On the return, the decedent's 15 percent interest in Rosboro was valued at $2,550,000. In a notice of deficiency, respondent determined that the fair market value of the decedent's partnership interest was $20,006,000. The petition in this case alleges that the correct fair market value of the decedent's partnership interest should have been $2,000,000. *43 Respondent now contends that based on Rosboro's liquidation value, the fair market value of the decedent's interest was $17,728,496. In the alternative, respondent contends that based on a going concern value, the decedent's interest was worth $6,300,000. Inclusion of Accrued Interest
On September 25, 1978, Watts purchased a certificate of deposit (C.D.) from Trust Company Bank. The C.D., which Watts held on the date of her death, had a face value of $800,000, bore interest at 8.75 percent per annum, and was payable at maturity on March 26, 1979. The C.D. provided "no payment of principal before, no interest after, maturity." The C.D. was silent with respect to prepayment penalties. On the date of Watts' death, $14,000 of interest had accrued on the C.D. ULTIMATE FINDINGS OF FACT 1. The fair market value of Watts' 15 percent partnership interest was $2,550,000 on the valuation date. 2. The accrued interest on Watts' certificate of deposit at the date of her death is includible in her gross estate. OPINION Property includible in the gross estate is included at its fair market value on the date of the decedent's death. Sec. 2031(a) [1]; sec. 20.2031-1(b), Estate *44 Tax Regs. Fair market value of an interest in a partnership is a net amount which a willing purchaser would pay for the interest to a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. The net amount is determined by considering all relevant factors. Sec. 20.2031-3, Estate Tax Regs. In determining the fair market value of Watts' interest, we must first decide whether we should give primary consideration to Rosboro's liquidation or going concern value. Respondent argues that primary consideration should be given Rosboro's liquidation value. Petitioner argues that primary consideration should be given Rosboro's going concern value. In the present case, the partnership agreement provided that upon the death of a partner, the partnership would either continue without dissolution or termination or would transfer the partnership business to a corporation. In compliance with the terms of the partnership agreement, the decedent's will bequeathed her partnershp interest in Rosboro to William *45 Hubert Lindsey, as trustee, and restricted the trustee from selling the interest. The language in these documents indicates Watts' and the other partners' intent to continue Rosboro as a going concern. Rosboro had long been a close family partnership and it was quite clear that all the partners and particularly Mr. Cole, the managing partner, intended to keep it that way. Rosboro was not dissolved upon Watts' death, nor was it going to be. There was no reasonable prospect of liquidation. Accordingly, we accept petitioner's going concern valuation approach. Because we do not adopt respondent's liquidation valuation approach, we rely on the values provided by three business valuation experts. Petitioner's business valuation experts are Edward S. Croft, III (Croft) and Shannon P. Pratt (Pratt). Croft is a senior vice president of Robinson Humphrey, American Express, Inc., a large, regional investment banking firm. He has been involved with approximately 75 to 100 valuations involving estate and gift taxes, employee stock ownership plans, and fairness opinions for mergers and acquisitions. In August and September of 1979, he prepared a valuation report of the decedent's partnership *46 interest. The report considered a number of factors and valuation approaches including market comparison, net book value, asset appraisal, capitalized excess earnings, and return on capital. Of the approaches considered, he selected what he considered to be the three most relevant. He then assigned weighting factors to the approaches based on their perceived relevance. Pratt is president of Willamette Management Associates, Incorporated, which is headquartered in Portland, Oregon. The company's primary activity is the valuation of businesses. Pratt also is the author of Investing in the Great Northwest and Valuing a Business, The Analysis and Appraisal of Closely Held Companies. The latter has been adopted by the American Society of Appraisers as its textbook for business valuation. Pratt prepared a valuation report of Watts' 15 percent interest in Rosboro. The factors and approaches Pratt considered in his report include price/latest year's earnings, price/five years' average earnings, price/book value, price/adjusted net asset value, capitalization of partner's withdrawals, sales of comparative companies and plants, and liquidating value if the partnership terminated. *47 In his analysis, Pratt utilized three approaches: capitalization of earnings, ratio of partnership interest value to book value and to adjusted net asset value, and capitalization of partner's withdrawals. Respondent's business valuation expert is Tony Leung (Leung). Leung has been active in financial management consulting and the valution of closely held business interests. His valuation experience covers businesses in various industries in Washington, Oregon, and Alaska. Leung utilized four valuation approaches: capitalization of earnings, capitalization of cash flow, capitalization of partner's distributions and multiple of timber value. After consideration of the several factors and approaches, and before the application of discounts, the respective expert valuations are as follows: 100 Percent of
15 Percent of
Company
Company
Croft
$28,200,000
$4,230,000
Pratt
Not Supplied
[2] 3,636,363
Leung
42,000,000
6,300,000
*48 Each expert had impressive credentials. Their reports were thorough and their testimony was plausible. We have carefully considered the reports of the experts, their testimony, and the lengthy briefs of the parties in which they have dissected the other parties' evidence in the greatest detail. We have considered the experience and background of the experts, their particular experience in the lumber and timber industry, the comparables which they have used, the extent to which they have investigated the subject company and the comparables, the assumptions that they have made regarding the future of the lumber business, appropriate capitalization rates, reasonable expected earnings, valuation of assets, and all of the other factors which each considered in arriving at his conclusion. No useful purpose would be served in regurgitating, summarizing, and synthesizing all of the reports. None of this would have any bearing on any future case, and no new methods have evolved which call for comment by the Court. We would merely be reinventing the appraisal wheel and applying it to Rosboro Lumber Company. Suffice it to say that after lengthy and careful consideration of the entire *49 record, we have found that the evidence of value by petitioner is more convincing than that of respondent. Buffalo Tool and Die Mfg. Co. v. Commissioner,74 T.C. 441, 452 (1980). Because petitioner presented two expert witnesses, we have taken the average of their values. Before applying any discount, Croft concluded that petitioner's 15 percent of the company was worth $4,230,000 and Pratt concluded that it was worth $3,636,363. These average out to $3,933,181. Accordingly, we find that as of December 7, 1978, the fair market value before discounts of the 15 percent interest was $3,933,181. With regard to the application of discounts, respondent argues that no discounts should be applied. Petitioner argues that discounts should be applied for lack of marketability, minority interest, and the fact that the interest is a general partnership interest. The experts applied discounts as follows: Discount factors
Discount applied
Croft
Lack of Marketability
35 percent
Minority Interest
Restrictive terms in
Partnership agreement
Intent of partners to
perpetuate status quo
Pratt
Lack of Marketability
45 percent
Leung
Lack of Marketability
20 percent
*50 We previously have allowed discounts to reflect the fact a partnership interest was a minority interest, not publicly traded, and subject to restrictive clauses in the partnership agreement. See Harwood v. Commissioner,82 T.C. 239, 268 (1984). It is quite clear from this record that a number of factors exist which call for a discount. This is a closely held partnership which has been in the hands of three families for many years. The partnership agreement makes it quite clear that it has been and is the intention of the partners to keep the business "in the family." Mr. Cole, the managing partner, testified that any attempt to sell to an outsider would meet with great resistance, including legal action if necessary. The experts have testified that there would be no market for a 15 percent interest in this company, and it seems quite obvious to the Court that any investor would be very reluctant to acquire a minority interest as an outsider in this family business. Minority interests in any business have certain obvious disadvantages which are exaggerated here. Accordingly, we find that a discount to reflect lack of marketability, minority interest, the restrictive *51 partnership agreement, and the historical intent of the partners is appropriate and applying our Solomon-like wisdom, we conclude that that discount should be 35 percent. Applying the discount to the previously determined value of the 15 percent interest, we find that the fair market value of the decedent's 15 percent interest as of the valuation date was $2,550,000. [3]
We have now come full cycle and, after weeks of preparation, days of trial, hundreds of pages of paper, thousands of dollars for lawyers, months of consideration by the Court and minutes reading the opinion, are back where petitioner started on the Form 706. Perhaps this reemphasizes the wisdom of Buffalo Tool and Die Mfg. Co. v. Commissioner,supra.
With regard to the interest on the certificate of deposit, petitioner argues that under the terms of the C.D. the decedent had no interest in or right to the accrued interest prior to the expiration of the full six month period. Respondent argues that the Federal Reserve Regulations *52 permit the withdrawal of funds in a C.D. without penalty on the death of the holder and therefore the interest to the date of death should be included in the gross estate. We agree with respondent. See 12 C.F.R. sec. 217.4 (1978). To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954 as amended and in effect in the tax year in issue.↩
2. Pratt, after applying a 45 percent discount, concluded that Watts' partnership interest was worth $2,000,000. Thus, we derived Pratt's value for Watts' interest before a discount by dividing $2,000,000 by 55 percent, i.e, $2,000,000 / .55 = $3,636,363.↩
3. $3,933,181 X .65 = $2,556,567. We note that valuing Watts' interest is not an exact science and, accordingly, have rounded off our final value to $2,550,000.↩